## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

David Baker,                                                    CASE NO.

       Plaintiff,

vs.

Andrew Viehmann, in his individual
capacity; and as an agent of the City of St.
Petersburg; and the City of St. Petersburg,
Florida, a municipal corporation,

       Defendants.

_____/           \

## **COMPLAINT**

NOW COMES the Plaintiff, David D. Baker ("Baker"), by and through his attorneys, Romanucci & Blandin, LLC and Russomanno & Borrello, P.A., and in complaining against Defendants Officer Andrew Viehmann ("Viehmann"), in his individual capacity and as an agent of the City of St. Petersburg, Florida; and the City of St. Petersburg, Florida ("St. Petersburg), a municipal corporation; pleading hypothetically and in the alternative, states as follows:

## **NATURE OF ACTION**

1.      This cause of action arises out of Defendant Officer Viehmann's unjustified tasing of David D. Baker on May 2, 2019, at approximately 1:00 am, at 1700 Prescott Street South, St. Petersburg, Florida.[1]

---

[1] David D. Baker hereby incorporates the helicopter video recording of the incident that was received from the Pinellas County Sherriff as Exhibit 1 to his Complaint.

2. On that date and at that time, Baker had his hands raised in the air and was surrendering himself to the St. Petersburg Police Department, as he begged the officers not to kill him.

3. Notwithstanding Baker's pleas and compliance with all commands, Officer Viehmann deployed his taser and struck David Baker.

4. Baker's body was then flooded with electricity causing immense pain and suffering.

5. There is not a single individual within the St. Petersburg Police Department who has approved Officer Viehmann's use of force.

6. Officer Viehmann, himself, has recognized the tasing was unjustified and stated he should not have done so.

7. Officer Viehmann was disciplined by the St. Petersburg Police Department and was suspended for 80 hours (10 days).

8. As egregious as the tasing of David Baker was, equally egregious was that the St. Petersburg Police Department had not provided a single minute of training to Viehmann prior to his first night of deployment on the Violent Crimes Task Force, which was May 2, 2019.

## JURISDICTION

9. This court has jurisdiction over federal questions pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343, as well as supplemental jurisdiction over state law claims arising out of the same case or controversy pursuant to 28 U.S.C. § 1367.

10. Specifically, this Court has jurisdiction over David Baker's civil rights claims brought pursuant to 42 U.S.C. § 1983 to redress Viehmann's deprivation of his clearly

established rights under color of law as secured by the Fourth and Fourteenth Amendment to the United States Constitution against Defendants Viehmann and the City of St. Petersburg.

11.    This Court also has jurisdiction over the corresponding state law claims arising from the same incident involving Defendants Officer Viehmann and the City of St. Petersburg brought pursuant to 28 U.S.C. § 1367.

## VENUE

12.    Venue is proper under 28 U.S.C. § 1391(b) because all incidents, events, and occurrences giving rise to this action occurred in this judicial district. Further, upon information and belief, all of the parties reside in this judicial district.

## PARTIES

13.    At all relevant times, Baker was a citizen of the United States and of the City of St. Petersburg in the state of Florida.

14.    At all relevant times, Officer Viehmann was a citizen of the United States and the state of Florida.

15.    At all relevant times, Officer Viehmann was employed by the City of St. Petersburg and the St. Petersburg Police Department as a duly appointed and sworn police officer.

16.    At all relevant times, Officer Viehmann was acting in his individual capacity, under color of law, and within the scope of his employment for and as an officer for the City of St. Petersburg.

17.     At all relevant times, Officer Viehmann was specifically working as a member of the St. Petersburg Police Department Violent Crimes Task Force ("VCTF") as a duly appointed and sworn police officer.

18. At all relevant times, the City of St. Petersburg was a political subdivision of the State of Florida, organized and existing under virtue of the laws of Florida.

19. At all relevant times, the St. Petersburg Police Department was an agency of the City of St. Petersburg, providing the vehicle through which the City fulfills its policing functions.

## FACTS COMMON TO ALL COUNTS

**A. Members of the St. Petersburg Police Department pursued David Baker for a non-violent offense before tasing him without any justification.**

20. On May 2, 2019, at approximately 12:45 am, St. Petersburg Police Department Deputy Anthony Hellstern from the St. Petersburg VCTF was operating in a covert civilian vehicle when he passed by Baker's truck.

21. Deputy Hellstern perceived Baker's vehicle to have illegal window tinting.

22. At this point, Hellstern radioed his probable cause to stop Baker's vehicle to which St. Petersburg VCTF Deputy Michael Krlin ("Krlin") responded.

23. A police helicopter, monitored by Deputy Wayne Zelinsky ("Zelinsky"), began following Baker's vehicle for Baker's illegal window tinting.

24. After being pursued, Baker eventually stopped his vehicle and emerged on foot westbound at the intersection of 17th Avenue South and 16th Street in St. Petersburg, Florida.

**B. Viehmann tased Baker while Baker had his arms in the air, hands empty, and pleading for his life while complying with all of the officers' commands.**

25. As officers were closing in on Baker at the aforementioned location, Officer Viehmann and Officer Seth Maranville arrived on the scene.

26. At this time, Baker was surrendering to police officers.

27. Baker walked towards the officers with his hands raised in the air.

28.    As Baker did so, he did not have any weapons in his hands.

29.    As Baker did so, he did not pose a threat to any police officers.

30.    As Baker did so, he did not pose a threat to anyone.

31.    Officer Viehmann, Officer Maranville, or some other police officer ordered Baker to keep his hands raised in the air and to get on the ground.

32.    Baker complied with those orders to keep his hands raised in the air.

33.    Baker complied with those orders to get on the ground.

34.    Baker kept his arms in the air and begun pleading for his life exclaiming, "Don't shoot me, don't shoot me," repeatedly.

35.    Baker then got on the ground where he kept his arms in the air as he placed himself in a seated position with his arms remaining above his head.

36.    As Baker complied with the seating instructions, Officer Zelinsky, who still had a clear view from the helicopter, radioed to the other police officers saying, "He's surrendering, he's surrendering."

37.    Baker then rolled from a seated position onto his side with his arms remaining above his head.

38.    While Baker was laying on the ground with his arms outstretched over his head, Officer Viehmann deployed his taser at Baker.

39.    Officer Viehmann's taser prongs made contact with Baker.

40.    Officer Viehmann's taser deployed electric charges into Baker's body.

41.    Baker's body spasmed as the electric charge flowed through his body.

42.    On May 2, 2021, while Baker was on foot with his hands raised in the air prior to Officer Viehmann deploying his taser, Baker never physically resisted arrest.

43.     On May 2, 2021, while Baker was on foot with his hands raised in the air prior to Officer Viehmann deploying his taser, Baker never verbally resisted arrest.

44.     On May 2, 2021, while Baker was on foot with his hands raised in the air prior to Officer Viehmann deploying his taser, Baker never resisted arrest in any way.

45.     On May 2, 2021, while Baker was on foot with his hands raised in the air prior to Officer Viehmann deploying his taser, Baker never had any weapon in his hand.

46.     On May 2, 2021, while Baker was on foot with his hands raised in the air prior to Officer Viehmann deploying his taser, Baker never posed a threat of death or great bodily harm to police officers

47.     On May 2, 2021, while Baker was on foot with his hands raised in the air prior to Officer Viehmann deploying his taser, Baker never posed a threat of death or great bodily harm to others in the area.

48.     On May 2, 2021, while Baker was on foot with his hands raised in the air prior to Officer Viehmann deploying his taser, Baker never posed a threat of death or great bodily harm to anyone.

49.     On May 2, 2021, while Baker was on foot with his hands raised in the air prior to Officer Viehmann deploying his taser, Baker never posed any threat to police officers.

50.     On May 2, 2021, while Baker was on foot with his hands raised in the air prior to Officer Viehmann deploying his taser, Baker never posed any threat to others in the area.

51.     On May 2, 2021, while Baker was on foot with his hands raised in the air prior to Officer Viehmann deploying his taser, Baker never posed any threat to anyone.

52.     On May 2, 2021, while Baker was on foot with his hands raised in the air prior to Officer Viehmann deploying his taser, Baker never attempted to flee from the officers.

53.     On May 2, 2021, while Baker was on foot with his hands raised in the air prior to Officer Viehmann deploying his taser, Baker never took any aggressive actions.

54.     On May 2, 2021, while Baker was on foot with his hands raised in the air prior to Officer Viehmann deploying his taser, Baker had no ability to physically threaten the officers.

55.     On May 2, 2021, while Baker was on foot with his hands raised in the air prior to Officer Viehmann deploying his taser, Baker had no ability to physically threaten anyone at the scene.

56.     Following Officer Viehmann's tasing Baker, officers on the scene placed Baker in handcuffs and arrested him.

57.     Officer Viehmann and other officers then placed Baker in a police vehicle and proceeded to laugh at and mock Baker.

**C.  After Officer Viehmann tased Baker, everyone agreed that Officer Viehmann's use of force was unnecessary and excessive in nature.**

58.     After observing what happened at the scene, Officer Maranville agreed that the amount of force used against Baker was unnecessary and excessive in nature.

59.     At his review board hearing, Officer Viehmann, himself, agreed that the amount of force used against Baker was unnecessary and excessive in nature.

60.     On May 2, 2019, Officer Viehmann provided his original police report of the incident.

61.     According to Sergeant James Regula of the St. Petersburg Police Department, Officer Viehmann's report raised "red flags," as it was unclear why Officer Viehmann deployed his taser.

62.     Sgt. Regula refused to approve Officer Viehmann's original police report.

63.    On May 3, 2019, Sgt. Regula called Officer Viehmann into his office to explain his original incident report.

64.    It was at that time that Officer Viehmann explained that he believed Baker to have a knife and that Baker was not complicit for some time so he felt as though he had to tase him.

65.    With these supplemental facts, Sgt. Regula believed the situation could have warranted force, so he allowed Officer Viehmann to rewrite his police report to include this information.

66.    On May 4, 2019, Officer Viehmann rewrote his police report including that Baker had a large visible knife on his person, and that he was not being complicit with orders.

67.    This was a lie.

68.    Officer Viehmann's report was then approved by Regula prior to him observing the helicopter footage of the evening.

69.    On May 5, 2019, after Sgt. Regula observed the helicopter video footage for the first time, he reported the situation to Major Brockman forwarding both the helicopter footage and Officer Viehmann's corresponding blue team report.

70.    Sgt. Regula also called Officer Maranville into his office to get his thoughts on Officer Viehmann's tasing of Baker.

71.    Officer Maranville explained that he had concerns over what had occurred and that he was conflicted over whether to approach a superior officer, but that he wished that he had.

72.    On May 6, 2019, Major Brockman e-mailed Detective Derrick Nelson ("Nelson") the helicopter footage as well as Officer Viehmann's corresponding blue team report.

73. On May 6, 2019, Detective Nelson was assigned to investigate Officer Viehmann's use of excessive force.

74. Det. Nelson received a full police report from the Pinellas County Sheriff's Office later that day.

75. On May 8, 2019, Officer Viehmann was assigned to the Telephone Reporting Unit pending the outcome of his Professional Standards Investigation.

76. On May 14, 2019, Officer Zelinsky—who was monitoring the helicopter footage— provided his sworn statement to Det. Nelson.

77. Officer Zelinsky stated that for most of the chase he had a clear view of the situation. He also stated that he remembered the officers on the scene stating, "he's compliant," while Baker appeared to be on his back, only to shortly after hear that a taser was deployed.

78. On May 15, 2019, Sgt. Regula provided his sworn statement to Det. Nelson. He provided that based on the helicopter video showing Baker's position, "It would have been impossible" for Baker to turn and run from officers at the time of his tasing.

79. On June 7, 2019, Officer Maranville provided his sworn statement to Det. Nelson.

80. Officer Maranville testified that on May 2, 2019, Baker had turned the corner with his hands in the air yelling, "Don't kill me, don't kill me."

81. Officer Maranville testified that Baker was complicit with all orders based on his training and experience.

82. Officer Maranville testified that Baker's arms never dropped from the air over his head.

83. Officer Maranville testified that he had "no idea that Baker had a pocketknife on him" until he was in custody.

84.     Officer Maranville testified that Baker was tased as he was lying on his stomach with his hands up.

85.     Officer Maranville testified that he was surprised that the tasing occurred at all.

86.     Officer Maranville testified, "I-I-I- to me I didn't understand why he did that" in reference to Officer Viehmann's tasing of Baker.

87.     Officer Maranville testified that he stated that he did not perceive Baker to be a threat to himself or others.

88.     Officer Maranville testified that the amount of force used by Viehmann at the scene was unnecessary and excessive—noting that Baker was passively uncooperative at most.

89.     On June 16, 2019, Officer Maranville appeared before the Command Review Board.

90.     Officer Maranville testified consistently with his interview in that Baker's resistance was "passive at most" and that the 3–4-inch pocketknife on Baker was not visible until he was searched.

91.     At the conclusion of his appearance, Officer Maranville was notified that he was being sustained for improper procedures, due to his failure to notify superiors of Officer Viehmann's excessive use of force.

92.     On June 19, 2019, Officer Viehmann provided his sworn statement to Det. Nelson.

93.     Officer Viehmann testified that Baker was actively resisting.

94.     Officer Viehmann testified that Baker's arms remained in the air and that the situation occurred "very quickly" stating that it was due to the lack of light and his adrenaline that the situation escalated as it did.

95.    Officer Viehmann testified that he was unaware that the helicopter was recording that evening, but that he still did not believe that his actions were excessive or unnecessary.

96.    On July 16, 2019, Viehmann appeared before the Command Review Board.

97.    At this hearing, Officer Viehmann admitted that he made mistakes.

98.    Officer Viehmann admitted that he was wrong in deploying his taser on the night in question.

99.    Officer Viehmann admitted that if he was able to go back in time and repeat the situation, he would not deploy his taser.

100.    At the close of this hearing, Officer Viehmann was informed that the charge of unnecessary use of force would be sustained against him.

101.    On July 16, 2019, Officer Maranville and Officer Viehmann each had complaints sustained against them.

102.    Officer Maranville's charge of following improper procedure was sustained.

103.    Officer Maranville was subject to an employee notice.

104.    Officer Viehmann's charge of unnecessary use of force was sustained.

105.    Officer Viehmann was subject to an 80-hour suspension.

106.    A sustained complaint means the investigation disclosed sufficient evidence to clearly prove the allegation made in the complaint.

107.    On December 10, 2019, the Criminal Justice Standards Commission of Florida affirmed that the penalties taken against Officer Viehmann by the St. Petersburg Police Department fell within the guidelines outlined in Fla. Admin. Code 11B-27.005.

**D. St. Petersburg Police Department failed to train their officers correctly in the policies and procedures of the VCTF, as well as the handling of evidence.**

108. In relevant part, it is the policy of the St. Petersburg Police Department that the use of force in any situation shall be limited to the force which is needed to halt aggressive actions and or to overcome specific resistance by the subject in order to accomplish a lawful objective.

109. Florida law provides that the deployment of force that is beyond that which is necessary to control and apprehend the subject is unlawful and subjects the St. Petersburg Police Department and the Officer to civil liability.

110. The St. Petersburg Police Department authorizes the use of tasers only when necessary, to take a person into custody for a violation of the law or protective custody for their own well-being.

111. A taser is not authorized for use if: the individual has no apparent ability to physically threaten the Officers or others; or the individual is offering only verbal or passive physical resistance.

112. May 2, 2019 was Officer Viehmann's first night working on the St. Petersburg Police Department's VCTF.

113. Prior to deploying his taser at Baker on May 2, 2019, Viehmann had only been with the VCTF for four hours.

114. Prior to deploying his taser at Baker on May 2, 2019, Viehmann had never received training on the VCTF and its policies.

115. Prior to deploying his taser at Baker on May 2, 2019, Officer Viehmann had never received training on the use of a taser with the VCTF.

116. Prior to deploying his taser at Baker on May 2, 2019, Officer Viehmann had never received training on the use of force.

117. Prior to deploying his taser at Baker on May 2, 2019, Officer Viehmann had received training on the use of a taser with the St. Petersburg's Police Department.

118. His training had taught him to never deploy his taser against someone who was passively resisting.

119. Nonetheless, he admittedly tased Baker when Baker was, at most, passively resisting.

120. On May 2, 2019, officers on the scene claimed to have found 10 Adderall pills, approximately 3 grams of marijuana, and a pocketknife on Baker at the time of his arrest.

121. Officer Maranville and Officer Viehmann admitted to knowing that both the marijuana and the pocketknife were tossed rather than documented into evidence.

122. Officer Maranville admitted that such disposal of evidence had occurred previously within the St. Petersburg Police Department.

123. Officer Maranville also admitted to not properly entering in the photos and evidence of the tasing of Baker.

124. This is despite it being the policy of the St. Petersburg Police Department to collect and photograph all materials related to a tasers discharge.

125. Officer Maranville also stated that he received no VCTF special training other than the training he already received during his time with the St. Petersburg Police Department, despite being with the VCTF for some years.

126.    Officer Viehmann had also not received any special training prior to the day of the incident, which was his first day on the job. However, he did note that he was specially trained two days later.

### Count 1 – 42 U.S.C. § 1983 – Fourth Amendment Violations
#### (David Baker v. Andrew Viehmann)

127.    Baker incorporates and re-alleges Paragraphs 1 through 125 as though fully pled herein.

128.    Officer Viehmann's conduct described herein constituted excessive force in violation of the Fourth Amendment of the United States Constitution, as incorporated through the Fourteenth Amendment of the United States Constitution.

129.    At all relevant times, Officer Viehmann acted in his individual capacity under color of state law, and as an agent of the City of St. Petersburg.

130.    At all relevant times, Officer Viehmann wore his official department uniform and was acting in the course and scope of his duties as a City of St. Petersburg police officer.

131.    At the time Officer Viehmann deployed his taser, Officer Viehmann had no reason to believe that Baker was armed.

132.    At the time Officer Viehmann deployed his taser, Baker never posed any risk or any threat—of death, great bodily harm, and/or otherwise—to anyone.

133.    At the time Officer Viehmann deployed his taser, Baker was not attempting to flee and was not a flight risk.

134.    At the time Officer Viehmann deployed his taser, Baker was non-violent.

135.    At the time Officer Viehmann deployed his taser, Baker was not suspected of committing any violent offenses.

136.    Officer Viehmann's tasing of Baker was objectively unreasonable.

137.   Officer Viehmann's tasing of Baker was in violation of clearly established law.

138.   Officer Viehmann's tasing of Baker is not protected by qualified immunity.

139.   As a result of Officer Viehmann's unjustified, excessive, and illegal use of force, Baker's body was flooded with electricity.

140.   As a result of Officer Viehmann's unjustified, excessive, and illegal use of force, Baker experienced conscious pain and suffering.

141.   As a result of Officer Viehmann's unjustified and excessive use of force, Baker was forced to undergo medical treatment, experience past pain and suffer, and will be forced to endure future pain and suffering.

WHEREFORE, David Baker demands judgment against Defendant Andrew Viehmann for all damages available to him under the law, including—but not limited to—past and future medical expenses, past and future pain, past and future suffering, punitive damages, costs, disbursements, attorneys' fees under 42 U.S.C. § 1988, pre-judgment and post-judgment interests, and for any further relief that this court deems fair and just.

**Count 2 – 42 U.S.C. § 1983 *Monell* Claim**
**Failure to Train**
**(David Baker v. City of St. Petersburg, Florida)**

142.   Baker incorporates and re-alleges Paragraphs 1 through 140 as though fully pled herein.

143.   At all relevant times, the City of St. Petersburg had in effect policies, practices, and/or customs that were the moving force behind Officer Viehmann's unconstitutional conduct, including but not limited to the excessive use of force.

144.   To the extent that the moving force behind Officer Viehmann's unconstitutional conduct were practices and/or customs, those practices and/or customs were so widespread

within the City of St. Petersburg that they had the force and effect of law as if they were express, written policies.

145. The City of St. Petersburg failed to properly train Officer Viehmann, including but not limited to matters related to proper arrest.

146. The City of St. Petersburg failed to properly train Officer Viehmann, including but not limited to matters related to the use of force.

147. The City of St. Petersburg failed to properly train Officer Viehmann, including but not limited to matters related to the use of tasers

148. The City of St. Petersburg failed to properly train Officer Viehmann, including but not limited to matters related to the policies and procedures of the VCTF.

149. Effectuating an arrest of an individual not resisting arrest is a usual and recurring situation with which St. Petersburg law enforcement officers and other agents encounter on a regular basis.

150. Effectuating an arrest of an individual passively resisting is a usual and recurring situation with which St. Petersburg law enforcement officers and other agents encounter on a regular basis.

151. Using force is a usual and recurring situation with which St. Petersburg law enforcement officers and other agents encounter on a regular basis.

152. Using a taser is a usual and recurring situation with which St. Petersburg law enforcement officers and other agents encounter on a regular basis.

153. The failure to train in the above-referenced areas constituted official policies of the City of St. Petersburg.

154. The failure to train officers in the above-referenced areas which occur on a regular basis demonstrates a deliberate indifference to the potential violation of constitutional rights.

155. Through its failure to train, the City of St. Petersburg was deliberately indifferent and exhibited reckless disregard with respect to the potential violation of constitutional rights.

156. St. Petersburg's policies, practices, customs, and/or failures were the moving force behind the actions of Officer Viehmann resulting in the injuries to Baker.

157. As a result of Officer Viehmann's unjustified and excessive use of force and the City of St. Petersburg's failure to train, Baker was forced to undergo medical treatment, experience past pain and suffering, and will be forced to endure future pain and suffering.

WHEREFORE, David Baker demands judgment against Defendant City of St. Petersburg for all damages available to him under the law, including—but not limited to—past and future medical expenses, past and future pain, past and future suffering, costs, disbursements, attorneys' fees under 42 U.S.C. § 1988, pre-judgment and post-judgment interests, and for any further relief that this court deems fair and just.

### Count 3 – Willful and Wanton
### (David Baker v. Andrew Viehmann)

158. Baker incorporates and re-alleges Paragraphs 1 through 140 as though fully pled herein.

159. At all relevant times, Officer Viehmann owed a duty of care to Baker to refrain from willful and wanton conduct which could endanger Baker's safety.

160. Defendant, Officer Viehmann, individually, breached the aforementioned duty by committing one or more of the following willful and wanton actions:

a. With utter indifference and conscious disregard, Officer Viehmann, pointed his taser at Baker under circumstances where Baker posed no immediate threat or danger to anyone;

b. With utter indifference and conscious disregard, Officer Viehmann, placed his finger on the trigger of his taser while pointing his weapon at Baker under circumstances where Baker posed no immediate threat or danger either to anyone;

c. With utter indifference and conscious disregard, Officer Viehmann, used excessive force against Baker under circumstances where Baker posed no immediate threat or danger to anyone;

d. With utter indifference and conscious disregard, Officer Viehmann, tased Baker in the abdomen, under circumstances where Baker was posing no immediate threat or danger to anyone;

e. With utter indifference and conscious disregard, Officer Viehmann, used excessive force against Baker, tasing Baker in the abdomen, under circumstances where Viehmann, knew that Baker was not holding any weapon;

f. With utter indifference and conscious disregard, made a false written report;

g. With utter indifference and conscious disregard, made a false statement;

h. With utter indifference and conscious disregard, failed to report to the City of St. Petersburg Police Department any violation of Rules and Regulations which is contrary to the policy, orders, or directives of the Department;

i. With utter indifference and conscious disregard, improperly permitted unnecessary use of his weapon;

j. With utter indifference and conscious disregard, acted in reckless disregard for the safety and/or life of Baker;

k. With utter indifference and conscious disregard, destroyed potential evidence; and/or

l. With utter indifference and conscious disregard, violated General Orders set forth by the City of St. Petersburg.

161. As a direct and proximate result of the tasing from Defendant Officer Viehmann, Baker was forced to undergo medical treatment, experience past pain and suffering, and will be forced to endure future pain and suffering.

WHEREFORE, David Baker demands judgment against Defendant Andrew Viehmann for all damages available to him under the law, including—but not limited to—past and future medical expenses, past and future pain, past and future suffering, punitive damages, costs, disbursements, pre-judgment and post-judgment interests, and for any further relief that this court deems fair and just.

### Count 4 – Respondeat Superior
#### (David Baker v. City of St. Petersburg, Florida)

162.    Baker incorporates and re-alleges Paragraphs 1 through 160 as though fully pled herein.

163.    At all relevant times, the City of St. Petersburg, acting by and though its duly authorized officer, agent, representative, and/or employee, including but not limited to Officer Viehmann, owed a duty of care to Baker to refrain from willful and wanton conduct which could endanger Baker's safety.

164.    That all times relevant hereto, it was the duty of Officer Viehmann, acting as an officer, agent, and/or employee of the City of St. Petersburg, to refrain from willful and wanton conduct which could endanger Baker's safety.

165.    Officer Viehmann, acting as an officer, agent, and/or employee of City of St. Petersburg, breached the aforementioned duty by committing one or more of the following willful and wanton actions:

   a. With utter indifference and conscious disregard, Officer Viehmann, pointed his taser at Baker under circumstances where Baker posed no immediate threat or danger to anyone;

   b. With utter indifference and conscious disregard, Officer Viehmann, placed his finger on the trigger of his taser while pointing his weapon at Baker under circumstances where Baker posed no immediate threat or danger either to anyone;

c. With utter indifference and conscious disregard, Officer Viehmann, used excessive force against Baker under circumstances where Baker posed no immediate threat or danger to anyone;

d. With utter indifference and conscious disregard, Officer Viehmann, tased Baker in the abdomen, under circumstances where Baker was posing no immediate threat or danger to anyone;

e. With utter indifference and conscious disregard, Officer Viehmann, used excessive force against Baker, tasing Baker in the abdomen, under circumstances where Viehmann, knew that Baker was not holding any weapon;

f. With utter indifference and conscious disregard, made a false written report;

g. With utter indifference and conscious disregard, made a false statement;

h. With utter indifference and conscious disregard, failed to report to the City of St. Petersburg Police Department any violation of Rules and Regulations which is contrary to the policy, orders, or directives of the Department;

i. With utter indifference and conscious disregard, improperly permitted unnecessary use of his weapon;

j. With utter indifference and conscious disregard, acted in reckless disregard for the safety and/or life of Baker;

k. With utter indifference and conscious disregard, destroyed potential evidence; and/or

l. With utter indifference and conscious disregard, violated General Orders set forth by the City of St. Petersburg.

166. As a direct and proximate result of the tasing from Defendant Officer Viehmann, acting as an officer, agent, and/or employee of the City of St. Petersburg, Baker was forced to undergo medical treatment, experience past pain and suffer, and will be forced to endure future pain and suffering.

WHEREFORE, David Baker demands judgment against Defendant City of St. Petersburg for all damages available to him under the law, including—but not limited to—past and future medical expenses, past and future pain, past and future suffering, costs, disbursements, pre-judgment and post-judgment interests, and for any further relief that this court deems fair and just.

## JURY DEMAND

David Baker hereby demands a trial by jury on all issues so triable.


Dated: December 7, 2021            Respectfully submitted,

Bryce T. Hensley (*pro hac vice to be filed*)
ROMANUCCI & BLANDIN, LLC
*Lead Counsel for Plaintiff David Baker*
321 North Clark St., Suite 900
Chicago, Illinois 60654
Tel: (312) 458-1000
Fax: (312) 458-1004
bhensley@rblaw.net


RUSSOMANNO & BORRELLO, P.A.
*Local Counsel for Plaintiff David Baker*
Museum Tower – Penthouse 2800
150 West Flagler Street
Miami, Florida 33130
Telephone: (305) 373-2101
Facsimile: (305) 373-2103

By: /s/ Herman J. Russomanno III
        Herman J. Russomanno III
        Fla. Bar No. 21249
        herman2@russomanno.com